Mr. Gass, you can proceed whenever you're ready. And please watch the clock if you want to save time for rebuttal. Thank you, Your Honor. Andy Gass from Latham & Watkins, on behalf of Defendant Appellant Pandora. With me at counsel table is my partner, Jessica Stebbins-Bena, and David Ring, in-house counsel at Pandora. I'd like to reserve 3 minutes of time for rebuttal, and I will do my best to watch the clock. Your Honor, as we approach the 8th anniversary of the filing of the complaint in this case, which remains unamended as of now, we seem to have reached the point in which we are relitigating issues that this court has already decided. And here's what I mean by that. I'm just going to quickly begin by walking you through some of the history, so we're on the same page about how we got where we are. Flow Entity files this complaint in October of 2014. Pandora files an anti-SLAPP motion. The district court denies it in February of 2015. September of 2015, Pandora files its brief in this court, saying, we think there's no public performance right. If there's any doubt about that, then you should certify the question to the California Supreme Court. In that brief, Pandora was crystal clear that the reproduction and distribution allegations, which we're effectively here fighting about now, rose and fall with the public performance issue. I mean, you're right. This case has had a lengthy and too long path. But the tricky part now is that we're here on the denial of an anti-SLAPP motion, and we're not here on the grant of a motion to dismiss in your client's favor. So we have to deal with the issue of whether you've met the SLAPP requirements first, and I'd like to hear from you on that. Let me address that directly, and then I'll go back to the chronology here, in which I think it's clear the court already decided that question, and the only issue is whether there's been an intervening change in law. So on the first prong of the anti-SLAPP issue, the question before the court is, of course, whether the liability alleged arises from conduct that constitutes an exercise of in furtherance of the free speech writing connection with a public issue. Flo and Eddie conceded below that, in their view, the issue was the music itself. I think we would generally agree with that. It's the music and the quality thereof. The Film on X Court, which they assert constitutes the intervening change in law since the district court initially decided this question in our favor, and I think that this court effectively agreed with the district court for reasons I'll get to. But that was pre-Film on? Correct, correct. The Film on X Court essentially establishes a two-part test. It says, first, you identify what is the issue of public interest, and second, you look to what the nexus is between that issue and the defendant's conduct. All of the interceding courts to have interpreted Film on X have concluded that it didn't change the analysis of the first issue, the question of what constitutes an issue of public interest. As the Old J Court, or at least the Serova Court, excuse me, articulates, Film on X approvingly cites the Rivera case, which essentially says there's three categories of issues that courts have previously said qualify. It could be about a public figure, it could be concerning conduct that affects a broad number of people, or it could just be any issue that the public is interested in. And the Sechrest case that we cite in our brief makes clear that, in fact, an issue of public interest means any issue that the public is interested in. So here, from our view, not only is it clear that the law of what the issue is hasn't changed, but it's equally clear that the conduct at issue qualifies. These are, as the complaint alleges, some of the most canonical recordings of the 20th century. Certainly the public has an interest in those. Just as, to cite some cases, the public may have had an interest in the identity of the band No Doubt, which was held to be an issue of public interest in the No Doubt v. Activision case. How does your client's streaming of this participate in or further the discourse on the public issue? Broadcasting the works themselves is the closest possible nexus to furthering the discussion of the public interest. You can't actually engage in a debate about the quality or the merits or the significance of the works without the broadcasting of them. And that's why every single court to have addressed the question has concluded that broadcasting, whether a television show or otherwise, constitutes protected activity within the meaning of the first prong of the anti-slap statute. Is that a fair description of what you're doing, of broadcasting? Broadcasting I think of as something that's somewhat different than just putting music out on a streaming platform. Well, I would strongly suggest that, for First Amendment purposes, there is no distinction between broadcasting over the airwaves and using Internet technology to broadcast. That may be true, but the anti-slap statute has some more specific requirements. I don't know, though, why it would make a difference to establishing whether conduct is in connection with an exercise of free speech in connection with an issue of public interest, whether the dissemination of the work was via the Internet or via the airwaves. Can you tease out further what is the public interest that you're furthering or participating in here with the song Happy Together? Yeah, so thank you, Your Honor. Again, the issue is the quality, the significance of the songs, and the exercise of free speech in connection with that public interest is disseminating the songs themselves for the public to assess those merits. You can't do that. Just as in the Seacrest case, the issue of public interest was reality TV stars, and the requisite nexus was established by broadcasting salacious footage of one of the stars in a semi-nude position. There's certainly no material difference there. And just as this court held in Hilton v. Hallmark. In that case, the issue was that the card company had used a celebrity's name and image and her trademark catchphrase in some greeting cards, and the bare dissemination of that content was held to satisfy subsection E-4 here of the statute. One frustration in this case among many, probably for both sides, is we're now here on the—we have this threshold issue of the slap. We have case law that says you can appeal that, so you are relying on that and have done so. But it's not clear to me that it's benefited you in any material way when this could have just been dealt with in a motion to dismiss. You have arguments under Sirius, and it could have come up that way. Instead, nothing's happened in the district court, and we're here having to deal with this threshold issue of the slap statute. Well, Your Honor, I respectfully disagree. I mean, but for the anti-slap statute, this case would have gone all the way through trial, one imagines, given Judge Gutierrez's, in retrospect, erroneous conclusion that there was a public performance right. So to the contrary, the slap statute has certainly done its work there, consistent with the court's holding in Batzel v. Smith that interlocutory review is available for these decisions. But let me get back, if I may, to the point that the court has already decided the substantive issue here. So we were here in this very courtroom in December of 2016. I was here. I remember it well. And the argument was being made, listen, we think it's clear that there is no public performance right. We think that it's clear that the Ninth Circuit is well qualified to decide that issue. But if there's any doubt, then go ahead and certify it to the California Supreme Court. We had argued in our brief in the alternative for that remedy, and we made clear that one of the requirements for certification in California Rule of Court 8.548A is that resolving the issue could resolve the matter. That's what the language of that statute says. You can't certify under that provision unless the question could resolve the matter. So we're here. We're debating this. The counsel for Flo and Eddie, different counsel, Mr. Gradstein at that point gets up. I think it's at minute 37 and 33 of the transcript, if memory serves. And he says certification is inappropriate, among other reasons, because we have these distribution and reproduction claims. So in no event would answering the public performance question actually resolve this case. And yet, over his objection, this court writes the opinion that it does in the initial instance of this litigation, in which it says, Dear California Supreme Court, we hereby certify to you the public performance questions, and we do so precisely because resolving them will end this case, or it could if the answer comes out in one particular way. So given that that already happened, you can appreciate that we are a little bit at a loss about why we're still debating this, because to us, this court has now answered the public performance question, and it seems that we already had collectively decided that if you do that, the ancillary copying claims rise and fall with that issue. That's exactly what happened in the Second Circuit subsequent to this court's certification. It's exactly what happened in the Florida Supreme Court, and it is plainly, we believe, the right answer here as well. Counsel, defendants get sued all the time in claims that are baseless. But there's something about anti-SLAPP that's intending to eliminate those claims because of the conduct of the defendant that's being protected. I think the trouble that maybe Judge Bress is having, and I'm certainly having with this case, is I don't see the mere broadcasting of music as being protected conduct. It seems to me that you will create a wide swath of conduct that's protected, if that's the view. Thank you, Your Honor. Respectfully, I think the statute addresses this issue fairly directly. So we have in Section 425.16E4 the broad definition of protected activity. Section 425.17, as Your Honors, I'm sure, well know, lays out an exception to conduct that would otherwise qualify under 425.16, and it says for certain kinds of commercial speech that would normally fall within the ambit of 425.16, you can't file an anti-SLAPP motion. Then it goes on in subsections C and D of 425.17 to enumerate a number of exceptions to the exception. So in other words, conduct that constitutes commercial speech that would be an exception to the anti-SLAPP provision, but we're going to carve them out and essentially put them back in. And one of the enumerated activities in that exception to the exception in 425.17 is precisely the dissemination of musical works. So the California legislature certainly seems to have taken the view that something about that very conduct was worthy of anti-SLAPP protection. And I will reiterate, there has never been a court that has held that broadcasting anything has not been an exercise of free speech rights in connection with an issue of public interest under California's anti-SLAPP statute. I appreciate that that may be broader than other states' anti-SLAPP statutes, it may be broader than the paradigmatic instance of an anti-SLAPP kind of motion, but as California courts have recognized over and over again, you adhere to the precedent and the words of the provision. If there are no further questions, I'll reserve the balance of my time. Thank you. Good morning.  Counsel, may I just start by asking, am I wrong in my interpretation of anti-SLAPP and that FilmOn really requires that there be some broadcasting and furtherance of a public debate, not just per se broadcasting, as opposing counsel seems to say? You're absolutely right that defendant needs to show more than just dissemination of a musical work, if I'm understanding your question correctly. And that's actually the first place I wanted to go. My friend on the other side made the point that broadcasting on its own, broadcasting of popular music or dissemination of popular music, we wouldn't characterize what Pandora does as broadcasting, but dissemination of popular music is per se protected under anti-SLAPP. That proposition has been squarely rejected by the California Court of Appeal on two occasions. So the first occasion was Dyer v. Childress. It's a case cited in our brief from 2007. It's pre-FilmOn, but it is a case that the FilmOn court actually relied on in coming to its conclusion. And that case involved a very popular movie from the 1990s called Reality Bites. And it was distributed to 3 million people. It was distributed on videocassette and DVD. And in that court, the defendant made the exact argument that my friend on the other side made here. It said that distribution of a popular artistic work is sufficient on its own to satisfy prong one. And, in fact, the defendant in that case actually relied on the commercial speech exception, made the same sort of espressolunius argument that Mr. Gass made up here. And the court rejected it. The court said that, no, on its own, just simply the scope of publication of some popular work isn't sufficient on its own, that you need to show some connection, some nexus between the alleged free speech activity on the one hand and the actual issue of public interest on the other. And that was in the Dyer case. And that's sufficient to dispose of Pandora's case on prong one. But in some instances, a broadcasting music could qualify, couldn't it? I mean, for example, suppose Pandora plays, you know, like John Lennon's Give Peace a Chance or Edwin Starr's War. Wouldn't that be entitled to some protection? They are communicating some issue of public interest given the context today. Based on the specific facts of a particular case, it's possible that dissemination of a musical work or artistic work could, yes, correct, could constitute, could satisfy prong one of the anti-SLAPP statute. But that's actually based on the specific facts of this case. And to answer your question, Judge Lee, I'd actually point you to Serova v. Sony Music, which is another post-Filmon case that Pandora cites. And that's an example of when dissemination of a musical work could meet prong one. In that case, again, the defendant, Sony Music, was distributing a Michael Jackson album. And it made the same argument that Pandora makes here, that distribution on its own is sufficient to establish prong one protection. And the court said, no, you have to do something more. And in that case, Sony Music had done something more because, as Your Honor mentioned, there was commentary on the album cover itself on a hotly contested issue of public debate, which was namely whether Michael Jackson was the lead vocalist on a particular track or someone else was. So there was a statement on the album that actually contributed to the public debate, which is the requirement that Filmon establishes that Pandora must meet here to meet prong one, to meet the threshold question of the prong one analysis. So, yes, when distribution of a musical work is contributing itself to a public debate, then that counts. Now, I would point out, Your Honor, that the common thread among the cases that Pandora cites is twofold. Either there's actually the creation of a creative work. So, for example, Pandora cites the Doe versus Gangland case. That involved the creation of a documentary that itself commented on gang issues. Or there's commentary on a creative work or commentary related to that creative work. That's the Stewart versus Rolling Stone case. Or the Sorova case that Pandora cites, where there's actually commentary on a hotly contested issue related to the Michael Jackson recording. None of that is present here. And I'd like to briefly turn to the two cases that my friend on the other side cites. The Hallmark case was decided before Filmon. And he also pointed to the Seacrest case. That involved, again, the creation of a reality TV show, the contents of which commented on an issue of public interest, namely the lives of models, which was sufficient in that case to establish anti-slap protection. Which is why here Pandora cannot show that it's entitled to anti-slap protection. And for that reason, the threshold question in this appeal is not met. I would add that Judge Bresci pointed out that this case has been essentially in a game of procedural ping-pong going back and forth. And that's exactly why the prong one issue should be dispositive of this appeal. In the time that we've litigated this case over the last eight years, we would have had time to proceed to final judgment on the merits. And there's no question that this court needs to enforce the threshold issue and remand to the district court. What's the end game here for you? Because obviously in the middle of all this is our court's decision in Sirius. So what argument do you have that if we can get past the anti-slap issues that you have a claim that survives that? Absolutely, Your Honor. This Sirius decision did not affect – wouldn't have affected the reason – doesn't change the basis to affirm here and certainly doesn't affect our claim for unauthorized reproduction. At issue in the Sirius appeal in this court, in the Ninth Circuit, was the question of whether there's a public performance right under California law. That's a separate question. That was at issue, and we don't dispute that any allegations related to public performance on their own independently are no longer at issue in this case. But as the district court properly held in this instance, this complaint, the Pandora complaint, includes additional allegations that Pandora made unauthorized reproduction of sound recordings, essentially operated a streaming service by which they created unauthorized reproductions and distributed them to its own servers and ultimately to Beam to end users. That's no different, for example, than the owner of 10 different music venues around California. If they were to take a copy of Happy Together, make 10 copies, distribute it to each one of those franchises, and play those songs simultaneously for profit, there's no – Sorry to interrupt. When you're referring to the right of reproduction, which specific copies are you referring to? I know there's an archival copy, there's a backup copy, there's a regional copy, and then there are also then copies, I guess, that are electronically sent to the user and then it's deleted. Are you including all of them? All of them with the potential exception of the initial archival copy. Under California law, it's likely that a single archival copy is probably fair use, but the remaining copies, the server copies, are all used for the purpose of distributing the music to end users and ultimately beaming them. So we would include both the regional copies that Pandora makes and keeps those as permanent server copies, as well as the ultimate copies that are temporarily transmitted to end users. Essentially, the argument is that Pandora is operating a digital distribution of copies – a service that's digitally distributing copies. If you include that last one, the temporary copy that are sent to the users, that seems to then implicate the SiriusXM case of right of public performance, because I'm not sure how you, given the technology, how you can perform that without a temporary copy being beamed to the users. Well, Your Honor, the SiriusXM case simply said that Flow and Eddie does not own a right of public performance. It does not give license to unauthorized copying in any way. And even under the SiriusXM case, there's no reason why Pandora would be allowed to publicly perform the sound recordings by actually making a multitude of copies. It could instead get an FCC license and play those copies over the radio or over the airwaves. And so it's not like the public performance right wouldn't exist if this court were to hold that a streaming service that operates by distributing multiple copies on its own would be problematic. I'd add that California has a specific statute, Penal Code 653H, which specifically prohibits copying for the purpose of public performance and for for-profit public performance. So it's clear that under California law, this conduct, even if Pandora was copying for the purpose of public performance, that would be prohibited. Right, but what about the exception for broadcasting? So it's an exception for radio broadcasting that's in connection with a broadcast transmission. This was a statute written in 1968, and there's no question that the legal backdrop behind that statute was the Federal Communications Act of 1934, which regulated radio broadcasting and made it clear that if you were engaged in radio broadcasting, that requires an FCC license. So AM, FM radio broadcasters, SiriusXM, all of them have FCC licenses. Pandora's streaming service is not operated under FCC license. Pandora wouldn't, for that reason, qualify as a radio broadcaster. The dictionary definition cited in our brief also confirmed that radio broadcasting really means broadcasting over the airwaves, not creating digital reproductions and operating a streaming service like Pandora's. Now, I would also, my friend on the other side also pointed to this court's prior certification order, and I'd like to address that briefly. The certification order does not affect the copying claims at issue in this case, and that's for two reasons. The first is the order doesn't address the allegations of copying whatsoever. There's no mention of the copying allegations, nor is there any mention of Pandora's defense to copying, like the fair use defense. And that's in part because the order on appeal addressed a completely different order, Judge Gutierrez's first order denying Pandora's anti-slap motion, and it also addressed a record that's somewhat different, completely different. The first order addressed, the first order denying Pandora's anti-slap motion rested entirely on the public performance right, and that's the reason why this court in the certification order concluded that the public performance right would have been dispositive, because of Judge Gutierrez's initial order denying Pandora's anti-slap motion. Since that time, this court in the first appeal vacated Judge Gutierrez's initial order, sent us back to the district court. Pandora filed a new anti-slap motion. There was discovery on Pandora's copying practices, and the district court ultimately denied, in a new order, denied Pandora's renewed anti-slap motion, and this time for the first time held that plaintiff's independent allegations of copying, irrespective of anything related to the public performance right, the independent allegations of copying were sufficient to state a claim for relief. So this is the first time this court has an opportunity to address an order that actually addresses the copying allegations on their own. But we wouldn't be the first court to address this, right? This has been litigated in a bunch of other courts, and they have rejected this. So in the context of the SiriusXM litigation, I believe Your Honor is referring to the Second Circuit decision and the Florida decision. Neither of those decisions have any bearing here, in large part because the conduct is substantially different. So in the SiriusXM Florida case, the court relied heavily on the fact that there was a radio broadcasting exemption. And SiriusXM, as I mentioned, is an over-the-air radio broadcaster. That's not the case for Pandora here. Pandora actually operates a streaming service where it essentially distributes digital copies around to its own servers and beams those copies to individual users. And so the conduct at issue here is substantially different. And the law, at least as for the Second Circuit decision, the law is also different between New York and California. How so? Primarily that California has a specific statute, section Penal Code 653H, which bars reproductions for the purpose of public performance. New York doesn't have a statute that explicitly prohibits that conduct. And so under California, the New York's holding ultimately was that if there's an ultimate use, then the means justify the end. That wouldn't make sense as a matter of California law because the California legislature has explicitly prohibited copying in aid of public performance. I'd add one more point, which is that those court decisions on the SiriusXM question were made in terms of fair use. And if this court were to analyze its own fair use precedent, it's clear that Pandora cannot establish its fair use defense as a matter of law. And that's for a couple of reasons. First, fair use depends on primarily two of the most important factors. The first is whether the use is transformative. And second is the effect on the market, the market harm requirement. And Pandora fails on both of those counts, at least to establish its fair use as a matter of law. This court has held that creating a digital reproduction of a sound recording, when that digital reproduction is used for the purpose of entertainment, that that's not a transformative use. That's the Napster case. And secondly, this court, with respect to the market harm requirement, has held two things. First, that market harm can be presumed when there's commercial for-profit activity involved. That's both the Napster case and the Disney v. Vidangel case cited in our brief. And in addition to that, I would be clear that Pandora doesn't offer a shred of evidence in the record on market harm whatsoever. There's nothing in the record, certainly not enough to overcome the presumption that there would be market harm in this case. And secondly, the Napster case also concluded that when there is a market, when a copyright holder is deprived of a market or an opportunity to sell additional authorized copies, that's sufficient to establish market harm. So here, that would be controlling of Pandora's fair use defense as well, because in this case, Pandora makes a series of copies, distributes them to their servers, and then distributes them to end users. And all of those copies, Pandora essentially avoids paying for them. And that's sufficient on its own to establish market harm and enough to at least for this court, if it reaches prong two, to affirm on the ground that Pandora has certainly not established its fair use defense beyond a dispute of material fact. But with my limited time remaining, I'd say that this court should not address the merits of this appeal at all, because Pandora hasn't come close to establishing the threshold question on the anti-SLAPP statute. And this court should affirm and remand for the court to actually address the merits of the claim and for us to reach final judgment and reach this court ultimately on a perfected appeal. Thank you. Lots of cover here, Your Honors, and I'll do my best to tick through some of the issues very quickly. First, you heard counsel suggest that the conduct at issue here is very different than the conduct that was at issue in the Sirius New York and Florida cases. That's simply not true. I would commend to your attention the decision of the Southern District of New York that subsequently went to the Second Circuit and then across the New York Court of Appeals, which articulates in painstaking detail all of the copying that was at issue in Sirius's technology. And what you will see in that case is that functionally in terms of how many copies are made, how they work, what they're for, we're looking at conduct that is materially indistinguishable from what's at issue in this case. Second point on the record issue, I'll note that we should be clear it is undisputed on the facts of this case that all of those copies are technologically necessary. You actually can't do the service that Pandora offers, a service that is authorized specifically under Section 114 of the Copyright Act, without making these copies. That's point one. Point two, I heard counsel suggest that with respect to... Can I pause you on point one? So the import of that is that we cannot disentangle the copying from the performance? Precisely, precisely. I'm sorry, go ahead. Just as the Second Circuit held. With respect to the certification issue, I heard counsel suggest that the prior appeal was only about public performance. That is 100% false. I was there. I litigated it in the district court. I litigated it here. You can read the briefs on appeal. Page five of our brief talked about the reproduction issue. Pages 41 to 42 of that brief say that the ancillary copying claims fail. Page 49 includes a long discussion of the degree to which the copying and distribution claims rise and fall with the performance issue. Three, on 653H, two quick points. Point one is subsection F of that statute says that it specifically may not enlarge or diminish the rights of litigants in private litigation. So I don't know how that could be dispositive then of the issue in this case. Relatedly, as the serious decision holds, in this unique context, there may be reason to conclude that dictionaries are probably not what the legislature was after. The radio broadcast exemption very plainly was intended to address the means by which copies are made in the service of transmitting audio to the public. That's plainly what the statute was about. Finally, last point, with respect to Dyer, a case that you heard a lot about, that was an issue where the liability alleged didn't really arise from anything that was of public interest at all because the whole point was that the guy on whom the Ethan Hawke character in Reality Bites was based said, like, hey, I'm not even a public person. You have, like, invaded my privacy. And the court agreed, nothing about this guy's life is an issue of public interest. He's just some guy. With that, I see I'm out of time. I do have one question. If you can address Mr. Nath's last point, which was that if we were to rule that under the first step of anti-slap analysis that the broadcast does not contribute further to public interest, do we stop there or should we address any other issues? No, I would urge you to supply some guidance for the district court to the extent that you can. This case has gone on long enough. We would be grateful for some words of wisdom that could hopefully bring this to an end on a 12C motion or something like that. Great. Thank you both for your excellent argument. The case has been submitted.
judges: LEE, BRESS, Fitzwater